**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| _____ ) | |
| **DAVID TERWILLIGER**, ) | |
| ) | |
| *Petitioner*, ) | |
| ) | |
| v. ) | |
| ) | |
| **ROLLIN COOK**, Commissioner, ) | **Case No.** 3:20-cv-540-SRU |
| Connecticut Department of Correction, and ) | |
| **NICK RODRIGUEZ,** Warden, ) | |
| Osborn Correctional Institution, ) | **ORAL ARGUMENT REQUESTED** |
| **)** | |
| ) | |
| *Respondents*. ) | |
| _____ ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..................................................................................................... ii

**INTRODUCTION** ................................................................................................................... 1

**FACTS** ...................................................................................................................................... 2

    I.    The COVID-19 pandemic is a public health crisis. .................................................. 2

    II.   Prisons are particularly susceptible to the spread of COVID-19. ...................................... 4

    III.   Respondents cannot adequately protect Mr. Terwilliger while he is incarcerated............ 6

    IV.   Mr. Terwilliger is particularly vulnerable given his age and underlying medical conditions. ................................................................................................................... 9

**ARGUMENT** ........................................................................................................................ 11

    I.    Standard of Review........................................................................................... 11

    II.   Mr. Terwilliger faces irreparable harm if he continues to be incarcerated. ..................... 12

    III.   Mr. Terwilliger is substantially likely to succeed on the merits of his claims................ 14

        A.   Respondents have exhibited "deliberate indifference" towards Mr. Terwilliger's medical needs in violation of the Eighth Amendment........................................................ 14

        B.   Respondents have discriminated against Mr. Terwilliger on the basis of his disability in violation of the ADA. .............................................................................................. 18

        C.   Exhaustion of state court remedies is not required and would be futile. ....................... 21

    IV.   The equities and public interest weigh in favor of releasing Mr. Terwilliger. ................. 26

    V.   This Court has the equitable power to release Mr. Terwilliger while his habeas petition is pending.................................................................................................................... 27

**CONCLUSION** ..................................................................................................................... **30**

## TABLE OF AUTHORITIES

### Cases

*AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384 (S.D.N.Y. 2002) ..................... 12

*Andino v. Fischer*, 555 F. Supp. 2d 418 (S.D.N.Y. 2008) ............................................................. 11

*Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) ................ 13

*Brock v. Wright*, 315 F.3d 158 (2d Cir. 2003) ...................................................................... 15, 16

*Brown v. Plata*, 563 U.S. 493 (2011) ........................................................................................... 29

*Castillo v. Barr*, No. CV 20-00605 (C.D. Cal. Mar. 27, 2020) ................................................... 13

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) ................................................................... 16

*Cholewinski v. Armstrong*, No. 3:98CV1964, 2000 WL 303252 (D. Conn. 2000) ..................... 24

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010) ............................................................................................................................... 12

*Conn. Dep't Envtl. Prot. v. OSHA*, 356 F.3d 226 (2d Cir. 2004) ................................................ 13

*Coronel v. Decker*, ---F.Supp.3d---, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) .... 2, 13, 26, 28

*DeShaney v. Winnebago County Dep't Soc. Servs.*, 489 U.S. 189 (1989) ................................... 15

*Detainees of Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392 (2d Cir. 1975) ... 29

*Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189 (2d Cir. 2014) .......... 20

*Duckworth v. Serrano*, 454 U.S. 1 (1981) .................................................................................... 22

*Estelle v. Gamble*, 429 U.S. 97 (1976) .................................................................................. 15, 16

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) .............................. 12

*Farmer v. Brennan*, 511 U.S. 825 (1994) .............................................................................. 16, 17

*Francis S. v. Stone*, 995 F. Supp. 368 (S.D.N.Y. 1998)*, 221 F.3d 100 (2d Cir. 2000)* ............... 23

*Fulton v. Goord*, 591 F.3d 37 (2d Cir. 2009) .............................................................................. 20

*Gates v. Henderson*, 568 F.2d 830 (2d Cir. 1977) ...................................................................... 23

*Gates v. Rowland*, 39 F.3d 1439 (9th Cir. 1994) ........................................................................ 21

*Gaymon v. Whidden*, No. 3:11-cv-805, 2011 WL 2078632 (D. Conn. 2011) ....................... 27, 28

*Grand River Enterprises Six Nations v. Pryor*, 425 F.3d 158 (2d Cir. 2005) ............................. 26

*Harrison v. Barkley*, 219 F.3d 132 (2d. Cir. 2000) ..................................................................... 16

*Hathaway v. Coughlin*, 37 F.3d 63 (2d Cir. 1994) ...................................................................... 16

*Helling v. McKinney*, 509 U.S. 25 (1993) ......................................................................... 12, 16, 17

*Hernandez v. Decker*, 2020 WL 1547459 (S.D.N.Y. Mar. 31, 2020) ......................................... 28

*Hill v. Mance*, 598 F. Supp. 2d 371 (W.D.N.Y. 2009) ................................................................ 24

*Iuteri v. Nardoza*, 662 F.2d 159 (2d Cir. 1980) .......................................................................... 27

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) .............................. 12

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) ............................................................................ 13

*JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75 (2d Cir. 1990) ........................................... 13

*Jumpp v. Cournoyer*, No. 3:15-CV-00892, 2016 WL 3647146 (D. Conn. 2016) ....................... 23

*Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224 (2d Cir. 1992)............................................................................................................... 11

*Lurie v. Wittner*, 228 F.3d 113 (2d Cir. 2000) ...................................................................... 22

*Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001) ..................................................................... 2, 27

*Mathis v. Hood*, 851 F.2d 612 (2d Cir. 1988).......................................................................... 24

*Maxum Petroleum, Inc. v. Hiatt*, No. 3:16-CV-01615 (VLB), 2016 WL 5496283 (D. Conn. 2016)....................................................................................................................................... 11

*New York v. Sullivan*, 906 F.2d 910 (2d Cir. 1990) ................................................................ 25

*Ostrer v. United States*, 584 F.2d 594 (2d Cir. 1978) ............................................................. 27

*Parks v. Blanchette*, 144 F. Supp. 3d 282 (D. Conn. 2015)..................................................... 19

*Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998).................................................. 19

*Pimentel v. Gonzales*, 367 F. Supp. 2d 365 (E.D.N.Y. 2005) ................................................. 24

*Planned Parenthood of New York City v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308 (S.D.N.Y. 2018).............................................................................................................. 26

*Rado v. Meachum*, 699 F. Supp. 25 (D. Conn. 1988) .............................................................. 27

*Rhem v. Malcolm*, 507 F.2d 333 (2d Cir. 1974) ..................................................................... 29

*Riddick v. Dep't of Corr.*, No. 3:13-CV-656, 2013 WL 6118354 (D. Conn. 2013).................... 19

*Riles v. Warden, State Prison*, No. 3:14CV1420, 2016 WL 1239220 (D. Conn. 2016) ............. 24

*Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1999) .............................................................. 12

*Sajous v. Decker*, 2018 WL 2357266 (S.D.N.Y. 2018)............................................................ 26

*Sapienza v. Vincent*, 534 F.2d 1007 (2d Cir. 1976) ................................................................ 24

*Savino v. Souza*, ---F.Supp.3d---, 2020 WL 1703844 (D. Mass. Apr. 8, 2020) ..................... 2, 28

*Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273 (1987) .......................................................... 21

*Stagliano v. Herkimer Cent. Sch. Dist.*, 151 F. Supp. 3d 264 (N.D.N.Y. 2015) ........................ 13

*Swain v. Murphy*, No. 308-CV-1394, 2010 WL 1279051 (D. Conn. 2010)................................ 24

*Torrez v. Semple*, No. 3:17-CV-1232, 2018 WL 2303018 (D. Conn. 2018)............................... 19

*U.S. ex rel. Goodman v. Kehl*, 456 F.2d 863 (2d Cir. 1972)..................................................... 24

*United States ex rel. Scranton v. New York*, 532 F.2d 292 (2d Cir. 1976) ............................... 22

*United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732 (D. Conn. Apr. 8, 2020) ............................................................................................................................. 2, 25, 29

*United States v. Nkanga*, No. 18-CR-713 (JMF), 2020 WL 1695417 (S.D.N.Y. Apr. 7, 2020)... 2, 28

*United States v. Perez*, No. 17 CR. 513-3, 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020)............. 25

*United States v. Zukerman*, No. 16 CR. 194, 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020)......... 25

*Washington v. Barr*, 925 F.3d 109 (2d Cir. 2019) .................................................................. 25

*Washington v. James*, 996 F.2d 1442 (2d Cir. 1993)............................................................... 22

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................ 11

*Wright v. New York State Dep't of Corr.*, 831 F.3d 64 (2d Cir. 2016) ........................................ 19

## Statutes

28 U.S.C. § 2241 ............................................................................................ 21, 22, 26

28 U.S.C. § 2254 ............................................................................................ 22, 26, 27

42 U.S.C. § 12102 .................................................................................................... 20

42 U.S.C. § 12132 .................................................................................................... 19

42 U.S.C. § 12182 .................................................................................................... 21

Connecticut General Statutes § 52-466 .................................................................. 23

## Other Authorities

Bill Chappell, *73% of Inmates at an Ohio Prison Test Positive for Coronavirus*, NPR (Apr. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus. ........................................... 4

Centers for Disease Control and Prevention, *COVID-19: U.S. at a Glance* (Apr. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases- in-us.html. ...................................................................................... 3

Complaint of Disability Rights Washington, et al. (Mar. 23, 2020), https://clearinghouse.net/chDocs/public/DR-WA-0003-0001.pdf ........................................... 21

Complaint, *Connecticut Criminal Def. Lawyers Ass'n v. Lamont*, No. HHD-CV20___-S, (April 3, 2020), https://www.acluct.org/sites/default/files/100.31_2020-04-03_complaint.pdf. .......... 8

Connecticut Department of Correction, *COVID-19 Tracker* (Apr. 16, 2020), https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories. ..................................................................................................... 7

Connecticut Department of Correction, *COVID-19 Tracker* (Apr. 17, 2020), https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories. ..................................................................................................... 7

Connecticut Department of Corrections, *Correctional Facility Population Count* (Apr. 22, 2020), https://portal.ct.gov/OPM/CJ-About/CJ-SAC/SAC-Sites/daily-Population-Counts/LineChart-Total. ......................................................................................................... 8

Connecticut Department of Public Health, *COVID-19 Update* (Apr. 18, 2020), https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary4182020.pdf?la=en. ..... 3

David Cloud & Brie Williams, *The Ethical Use of Medical Isolation—Not Solitary Confinement—to Reduce COVID-19 Transmission in Correctional* Settings (Apr. 9, 2020), https://amend.us/wp-content/uploads/2020/04/Medical-Isolation-vs-Solitary_Amend.pdf. ....... 8

Department of Corrections and Community Supervision, *COVID-19 Report Daily Update*, https://doccs.ny.gov/doccs-covid-19-report (last visited April 21, 2020). ................................ 5

Eliza Fawcett & Steven Goode, *State Department of Correction Moves Inmates with COVID-19 to Northern Correctional Institution, Though Quarantine Questions Persist*, Hartford Courant (Apr. 10, 2020), https://www.courant.com/coronavirus/hc-news-coronavirus-northern-correctional-institution-20200410-scty5r36yzgzflkw7a3iuw7gam-story.html. ............... 7, 8, 17

Eliza Fawcett, *With COVID-19 Threat Looming, State Prisons and Jails Are on Edge*, ............... 9

iv

Habeas Petition, *Lowery v. Cook*, No. 3:20-cv-00528 (D. Conn. Apr. 17, 2020), https://drive.google.com/file/d/1qXE6MRGTG7Y9wYPRZ1hQgnhBJMjsSfxi/view. ............. 8

Jenna Carlesso & Kelan Lyons, *One Year after DOC Took Over Inmate Healthcare, Troubles Persist*, Conn. Mirror (July 2, 2019), https://ctmirror.org/2019/07/02/one-year-after-doc-took-over-inmate-healthcare-troubles-persist. ............................................................................. 9, 18

Kelan Lyons, *Shifting Plans and a COVID-19 Outbreak at a Connecticut Prison*, CT Mirror (Apr. 17, 2020), https://ctmirror.org/2020/04/17/shifting-plans-and-a-covid-19-outbreak-at-a-connecticut-prison ............................................................................................................... 18

Lisa Backus, *Staffing Shortage Creates 'Dangerous' Situation in CT Prisons*, Conn. Post (Feb. 3, 2020), .................................................................................................................................... 9

Ohio Department of Rehabilitation and Correction, *COVID-19 Inmate Testing*, https://drc.ohio.gov/Portals/0/DRC%20COVID-19%20Information%2004-19-2020%20%201305.pdf (last visited Apr. 21, 2020). ................................................................... 4

State of Connecticut Judicial Branch, *COVID-19 Information from the Connecticut Judicial Branch* (Apr. 17, 2020), https://jud.ct.gov/COVID19.htm ...................................................... 23

Taylor Hartz, *Dozens of Protestors Call for Prisoner Release as First Inmate Death from COVID-19 Reported*, The Day (Apr. 13, 2020), https://www.theday.com/article/20200413/NWS01/200419781. ............................................ 7

World Health Organization, *Coronavirus Disease 2019: Situation Report – 89* (Apr. 18, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200418-sitrep-89-covid-19.pdf?sfvrsn=3643dd38_2 ....................................................................................... 2

Zunyou Wu & Jennifer M. McGoogan, *Characteristics of and Important Lessons from the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72,314 Cases from the Chinese Center for Disease Control and Prevention*, 323(13) J. Am. Med. Ass'n 1239, 1239 (2020). ........................................................................ 4, 10, 14, 20

**INTRODUCTION**

Petitioner David Terwilliger is an eighty-year-old disabled veteran with grave medical conditions approaching the final year of a twenty-year sentence in Connecticut state prison. On April 7, 2020, Respondents approved Mr. Terwilliger for community release, confirming that even Respondents agree he can be released consistent with public safety goals. Yet today he remains confined in perilous conditions by Respondents. Through this motion, he respectfully requests that this Court issue a temporary restraining order for emergency relief—admission to bail for immediate release pending a ruling on his habeas petition—because he is at imminent risk of contracting severe COVID-19. This extraordinary request is supported by the extraordinary circumstances of this global pandemic, which poses risks of serious illness or death to incarcerated individuals of Mr. Terwilliger's age and health status.

COVID-19 has already spread widely in the state prison system, and Respondents have not taken adequate steps to prevent further spread. As of April 22, 244 Connecticut Department of Correction ("DOC") staff members and 321 incarcerated individuals have contracted the virus. On April 13, the first incarcerated individual in Connecticut who tested positive died. The immediate release of vulnerable individuals is now the only way to mitigate the spread of this deadly disease.

As a result of Respondents' policies, Mr. Terwilliger continues to be held in life-threatening conditions at Osborn Correctional Institute ("Osborn CI"), which lacks adequate disease-preventing procedures and equipment. The status quo amounts to an ongoing deprivation of Mr. Terwilliger's constitutional and statutory rights under the Eighth Amendment and the Americans with Disabilities Act ("ADA"), respectively.

This Court has the inherent authority to admit Mr. Terwilliger to bail immediately, pending adjudication of this habeas petition, *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), and it should exercise that authority swiftly. This Court is Mr. Terwilliger's only venue for relief. Every day that Mr. Terwilliger is imprisoned, rather than released to the community as Respondents have already approved, is another day he is subjected to an unjustifiably increased risk of contracting COVID-19 and suffering serious illness or death—in other words, permanent and irreparable harm. Moreover, Mr. Terwilliger has a stable home environment he can return to if released, where he can self-quarantine for as long as is necessary. District courts around the country have recognized the gravity of the current situation and have ordered vulnerable individuals released from prison and other forms of government detention under similar circumstances. *See, e.g.*, *Savino v. Souza*, ---F.Supp.3d---, 2020 WL 1703844 (D. Mass. Apr. 8, 2020); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732 (D. Conn. Apr. 8, 2020); *United States v. Nkanga*, No. 18-CR-713 (JMF), 2020 WL 1695417 (S.D.N.Y. Apr. 7, 2020); *Coronel v. Decker*, ---F.Supp.3d---, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020). Mr. Terwilliger respectfully requests that this Court do the same.

## FACTS

### I.     The COVID-19 pandemic is a public health crisis.

COVID-19 is a highly infectious, novel coronavirus that has reached pandemic status. As of April 18, 2020, over 2,160,000 individuals in over 110 countries and territories have been diagnosed with coronavirus and 146,088 people have died as a result.[1] In the United States alone,

---

[1] World Health Organization, *Coronavirus Disease 2019: Situation Report – 89* (Apr. 18, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200418-sitrep-89-covid-19.pdf?sfvrsn=3643dd38_2.

over 690,000 people have been diagnosed with coronavirus as of April 18, 2020,[2] with 19,815 confirmed cases in the state of Connecticut and 1,331 deaths.[3] A vaccine for COVID-19 is not expected to be available for another 12 to 18 months. Declaration of Frederick L. Altice ¶ 28 ("Altice Decl."). COVID-19 is 10 times deadlier than the common flu. *Id.* ¶ 9. It causes severe disease in approximately 16% of cases. Declaration of Gregg S. Gonsalves ¶ 3 ("Gonsalves Decl."). Around 20% of infected patients require hospitalization. Altice Decl. ¶ 9. The observed fatality rate of COVID-19 will increase significantly if local healthcare resources are overwhelmed. Gonsalves Decl. ¶ 21. Fatality rates for coronavirus are also higher for certain subpopulations: older adults—particularly those 70 years of age and older—and people of any age with serious underlying medical conditions such as heart disease. Altice Decl. ¶ 10. Individuals in these subpopulations are at a substantially higher risk of developing severe illness from COVID-19, and are therefore at a higher risk for hospitalization, intensive care needs, and death. *Id.*

Transmission of COVID-19 is thought to occur predominantly via person-to-person contact and contact with infected surfaces. Altice Decl. ¶ 12. Coughing and sneezing produce respiratory droplets which spread COVID-19 to individuals in close proximity—as far as six feet away. *Id.* The virus can remain in the air for several hours and on surfaces for several days. *Id.* Containment and social distancing are two primary interventions to prevent the spread of COVID-19. *Id.* ¶ 8. Containment includes intensive handwashing, decontamination of surfaces,

---

[2] Centers for Disease Control and Prevention, *COVID-19: U.S. at a Glance* (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases- in-us.html.
[3] Connecticut Department of Public Health, *COVID-19 Update* (Apr. 18, 2020), https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary4182020.pdf?la=en.

and identification and isolation of infected individuals and close contacts. Gonsalves Decl. ¶ 17. Social distancing involves remaining at least 6 feet from other people. Altice Decl. ¶ 20.

COVID-19 progresses in two phases. Altice Decl. ¶ 11. In the first, an individual may be asymptomatic but more often present with symptoms like cough, congestion, and fever; viral transmission during this phase is particularly likely. *Id.* In the second, life-threatening, phase, about 20% of infected patients develop progressive lung disease requiring hospitalization. *Id.* Most of those requiring mechanical ventilation die. *Id.* 2.3% of all patients who contract the virus die.[4] For those who survive, a prolonged recovery is anticipated. Gonsalves Decl. ¶ 7. Extensive rehabilitation secondary to profound deconditioning, neurologic damage, and loss of respiratory capacity can be expected for those who have experienced an illness of this severity. *Id.*

## II.     Prisons are particularly susceptible to the spread of COVID-19.

Prisons have become some of the largest hotspots of coronavirus outbreaks in the United States. Just one Ohio facility—Marion Correctional Institution—has 1,828 confirmed cases.[5] Over 70% of the incarcerated population of that prison has contracted COVID-19, and the prison accounts for 20% of the entire state's cases of the illness.[6] In New York, there are over 1,000 confirmed COVID-19 cases in jails and prisons, of which approximately 80% are correctional

---

[4] Zunyou Wu & Jennifer M. McGoogan, *Characteristics of and Important Lessons from the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72,314 Cases from the Chinese Center for Disease Control and Prevention*, 323(13) J. Am. Med. Ass'n 1239, 1239 (2020).
[5] Ohio Department of Rehabilitation and Correction, *COVID-19 Inmate Testing*, https://drc.ohio.gov/Portals/0/DRC%20COVID-19%20Information%2004-19-2020%20%201305.pdf (last visited Apr. 21, 2020).
[6] Bill Chappell, *73% of Inmates at an Ohio Prison Test Positive for Coronavirus*, NPR (Apr. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus.

staff.[7] This high rate of COVID-19 infection among staff is a particularly significant challenge for preventing viral spread within facilities.

This trend mirrors prior outbreaks within prisons: prisons are congregate settings that are particularly susceptible to the spread of infectious diseases. Altice Decl. ¶ 13. For example, HIV, Hepatitis B and C, and tuberculosis are significantly more common in prisons than in the community-at-large. *Id*. In addition, severe outbreaks of H1N1 influenza occurred in prisons during the epidemic in 2009. Gonsalves Decl. ¶ 15.

Prisons are poorly equipped to handle COVID-19, as evidenced by their response to other contagions. Altice Decl. ¶ 17. Outbreaks of tuberculosis have proven hazardous, and in some cases deadly, as prisons are unable to efficiently diagnose, isolate, and treat people who are infected. *Id.* COVID-19 differs substantially from tuberculosis due to its higher prevalence in the community and efficient mode of transmission. *Id.* These factors are exacerbated by the inability to isolate people who are infected or are at risk of becoming infected with COVID-19, and the heightened potential for correctional officers and other staff to transmit COVID-19 from the outside community into prisons. *Id.*

Screening and isolation of symptomatic cases alone will not prevent viral spread in Connecticut's prison system; prisons face a daily influx of persons from community settings, including both correctional staff and newly incarcerated individuals. Altice Decl. ¶ 16. Incarcerated individuals are constantly in close proximity, and regularly interact with communal surfaces. *Id.* ¶ 15. Social distancing cannot be effectively accomplished in prison settings because of the inability to create physical barriers between beds, the use of common spaces like

---

[7] Department of Corrections and Community Supervision, *COVID-19 Report Daily Update*, https://doccs.ny.gov/doccs-covid-19-report (last visited April 21, 2020).

dining halls, showers, and bathrooms, the lack of sanitary equipment to regularly disinfect surfaces, the lack of personal protective equipment for personnel and prisoners alike, and the inability to identify asymptomatic infectious persons. *Id.* ¶ 20.

Individuals experiencing severe COVID-19 infections—often older inmates and those with multiple comorbidities—will need to be transported to local hospitals and, often, to intensive care units because prisons do not have the adequate facilities or equipment to treat seriously ill patients. Altice Decl. ¶ 19. Most prison health care systems are more akin to outpatient health care clinics—they lack the necessary emergency medical equipment, personal protective equipment, and other necessary supplies to treat those in severe respiratory distress. *Id.* Outside healthcare systems, already overburdened by growing caseloads, are likewise unable to handle an influx of patients from prisons which, if significant preventive measures are not taken, could be substantial. *Id.*

**III.     Respondents cannot adequately protect Mr. Terwilliger while he is incarcerated.**

Conditions across DOC facilities and in Osborn CI, where Mr. Terwilliger is detained, present significant potential for rapid spread of COVID-19—at Osborn, both inmates and corrections officers have already tested positive for COVID-19. On April 9, DOC first confirmed that an incarcerated person tested positive for COVID-19 at Osborn CI. That individual shared a housing unit with other incarcerated people. In an alarming example of the Respondents' inadequate approach to protecting inmates from exposure to COVID-19, a Thursday, April 9, email from a DOC spokesperson noted that "a few offenders were inadvertently released for a short period of time from the quarantine unit."[8] Though the spokesperson said those inmates

---

[8] Eliza Fawcett & Steven Goode, *State Department of Correction Moves Inmates with COVID-19 to Northern Correctional Institution, Though Quarantine Questions Persist*, Hartford Courant

were "quickly recalled as soon as the error was discovered," as of Friday, April 10, nine others from the same unit had tested positive for COVID-19.[9] It is impossible to say how many additional inmates were infected due to the error.

The facility layouts at prisons such as Osborn CI provide little ability to achieve social distancing. Gonsalves Decl. ¶ 16. Spaces are poorly ventilated, toilets, sinks and showers are shared, and food preparation is communal, with little opportunity for adequate surface disinfection. *Id*. Individuals in Osborn CI have tested positive for COVID-19, and on April 13, DOC reported the first death of an Osborn CI inmate from COVID-19. The inmate was sixty-two years old.[10] Since then, additional individuals at Osborn CI have tested positive for COVID-19. On April 16[11] and April 17[12] respectively, six and three individuals incarcerated at Osborn CI who tested positive were transferred to Northern CI's Medical Isolation Unit. Mr. Terwilliger shares a cell with a cell mate—increasing his risk of exposure. Declaration of David Terwilliger ("Terwilliger Decl.") ¶ 5.

In other DOC facilities, staff have returned prisoners who have high temperatures back to their dormitories if they do not have additional symptoms, even though fever is a hallmark

---

(Apr. 10, 2020), https://www.courant.com/coronavirus/hc-news-coronavirus-northern-correctional-institution-20200410-scty5r36yzgzflkw7a3iuw7gam-story.html.
[9] *Id*.
[10] Taylor Hartz, *Dozens of Protestors Call for Prisoner Release as First Inmate Death from COVID-19 Reported*, The Day (Apr. 13, 2020),
https://www.theday.com/article/20200413/NWS01/200419781.
[11] Connecticut Department of Correction, *COVID-19 Tracker* (Apr. 16, 2020),
https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories.
[12] Connecticut Department of Correction, *COVID-19 Tracker* (Apr. 17, 2020),
https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories.

symptom of COVID-19.[13] Inmates in DOC custody report a lack of adequate access to hand sanitizer, cleaning supplies, and soap to protect themselves from infection.[14]

To date, Respondents have failed to take steps to meaningfully reduce their inmate population: as of April 22, there were 3,070 people in pre-trial detention, and 8,208 people serving sentences of incarceration in Connecticut's prison system,[15] down from 3,393 pretrial detainees and 8,891 sentenced inmates on January 1, 2020.[16] While population reductions of any size are more desirable than none, a reduction of this size is insufficient to slow the virus's spread. Respondents have instead increased both the inhumanity and ineffectiveness of their response through the piecemeal removal of inmates into conditions of solitary confinement at Northern Correctional Institute,[17] a super-max facility that is medically and constitutionally inappropriate for Mr. Terwilliger.[18]

Connecticut has long struggled to provide adequate medical services to inmates; its medical infrastructure is ill-equipped to handle an outbreak of this magnitude. In July 2019, DOC had 309 nurses on staff to serve 13,320 prisoners, or one nurse for every 43 prisoners; it

---

[13] Habeas Petition at 4, *Lowery v. Cook*, No. 3:20-cv-00528 (D. Conn. Apr. 17, 2020), https://drive.google.com/file/d/1qXE6MRGTG7Y9wYPRZ1hQgnhBJMjsSfxi/view.
[14] *Id.*
[15] Connecticut Department of Corrections, *Correctional Facility Population Count* (Apr. 22, 2020), https://portal.ct.gov/OPM/CJ-About/CJ-SAC/SAC-Sites/daily-Population-Counts/LineChart-Total.
[16] Complaint at 6, *Connecticut Criminal Def. Lawyers Ass'n v. Lamont*, No. HHD-CV20___-S, (April 3, 2020), https://www.acluct.org/sites/default/files/100.31_2020-04-03_complaint.pdf.
[17] Eliza Fawcett & Steven Goode, *State Department of Correction Moves Inmates with COVID-19 to Northern Correctional Institution, Though Quarantine Questions Persist*, Hartford Courant (Apr. 10, 2020), https://www.courant.com/coronavirus/hc-news-coronavirus-northern-correctional-institution-20200410-scty5r36yzgzflkw7a3iuw7gam-story.html.
[18] *See, e.g.*, David Cloud & Brie Williams, *The Ethical Use of Medical Isolation—Not Solitary Confinement—to Reduce COVID-19 Transmission in Correctional* Settings (Apr. 9, 2020), https://amend.us/wp-content/uploads/2020/04/Medical-Isolation-vs-Solitary_Amend.pdf.

employed one doctor or physician's assistant for every 579 prisoners.[19] In February of this year, 139 healthcare positions were vacant out of 843 budgeted.[20] DOC medical staff have themselves spoken publicly about the possibility of systemic failure.[21]

Given the numerous inadequacies in Respondents' COVID-19 response, Mr. Terwilliger cannot safely remain physically confined in any DOC correctional institution. The only forms of housing available to DOC inmates are congregant housing or solitary confinement, each of which pose unique dangers for Mr. Terwilliger as an elderly, disabled veteran with multiple comorbidities.

## IV.  Mr. Terwilliger is particularly vulnerable given his age and underlying medical conditions.

Mr. Terwilliger, an honorably discharged U.S. Navy and Marine Corps veteran, is eighty years old. Given his age and underlying health conditions, Mr. Terwilliger is at risk of severe, debilitating illness and death were he to contract COVID-19. He was born on July 22, 1939, in Jersey City, New Jersey. Terwilliger Decl. ¶ 1. He left high school to enlist in the United States Marine Corps in 1957. Declaration of Casey Smith ("Smith Decl."), Exh. C at 4-5. He was honorably discharged in 1963 after deployments to Lebanon and Cuba. *Id.* at 5. He married, had children, and re-enlisted with the United States Navy as a reservist, later transitioning once again to active duty. *Id.* at 4-5. In 1992, he retired from the Navy with an honorable discharge, after

---

[19] Jenna Carlesso & Kelan Lyons, *One Year after DOC Took Over Inmate Healthcare, Troubles Persist*, Conn. Mirror (July 2, 2019), https://ctmirror.org/2019/07/02/one-year-after-doc-took-over-inmate-healthcare-troubles-persist.

[20] Lisa Backus, *Staffing Shortage Creates 'Dangerous' Situation in CT Prisons*, Conn. Post (Feb. 3, 2020),
https://www.ctpost.com/local/article/Staffing-shortage-creates-dangerous15027264.php.

[21] Eliza Fawcett, *With COVID-19 Threat Looming, State Prisons and Jails Are on Edge*, Hartford Courant (Mar. 28, 2020), https://www.courant.com/coronavirus/hcnews-coronavirus-connecticut-prisons-20200328-pvg57sfcafh5zck4wftabooxrestory.html.

more than 21 years of active duty service, *id.*, earning multiple medals and awards during his service, Smith Decl., Exh. A at 1. After his service, he divorced, remarried, and worked as a truck driver. Smith Decl., Exh. C at 4-5. Mr. Terwilliger has been in prison since 2003, after a tragic dispute in his driveway led to the death of his son-in-law and his conviction for manslaughter. *Id.* at 5. He is due for release in September 2021, after serving a twenty-year sentence, and has been approved for community release to Hartford, Connecticut, for the last two weeks. Declaration of David Terwilliger ¶¶ 2-3.

Today, Mr. Terwilliger suffers from a number of health conditions placing him at risk should he contract COVID-19. Indeed, the DOC itself recognizes the severity of Mr. Terwilliger's health conditions, categorizing him as a level 4 out of 5 on its internal health scale (with level 5 indicating those with the most serious health conditions). Smith Decl., Exh. D at 1. On at least two separate occasions, Mr. Terwilliger was hospitalized after a heart attack. Declaration of Mary DeSalvo ("DeSalvo Decl.") ¶¶ 8-9. He also suffers from coronary artery disease. Smith Decl., Exh. D at 1. While the largest study of COVID-19 patients found an overall case-fatality rate ("CFR") of 2.3%, the CFR for individuals with cardiovascular disease is 10.5%, approximately five times that of the general population.[22] The CFR for individuals aged 80 years and older is 14.8%—approximately seven times that of the general population.[23]

In addition to his cardiovascular problems, Mr. Terwilliger suffered a stroke. Smith Decl., Exh. C at 5. He has also experienced transient ischemic attacks. Smith Decl., Exh. B at 1. He previously had pneumonia and pleurisy, and currently has chronic high blood pressure.

---

[22] Zunyou Wu & Jennifer M. McGoogan, *Characteristics of and Important Lessons from the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72,314 Cases from the Chinese Center for Disease Control and Prevention*, 323(13) J. Am. Med. Ass'n 1239, 1239 (2020).
[23] *Id.*

DeSalvo Decl. Exh. ¶ 10; Smith Decl., Exh D at 1. On one occasion he was hospitalized for fainting, and he struggles with labored breathing in prison. DeSalvo Decl. ¶ 10. He also has degenerative joint disease. Smith Decl., Exh. B at 4. Before he was incarcerated in 2003, the Department of Veterans Affairs ("VA") classified Mr. Terwilliger as disabled, with a 30 percent disability rating, based on its determination that his transient ischemic attacks, hearing loss, and degenerative joint disease were related to his service. *Id.* at 1-2.

Mr. Terwilliger is currently incarcerated at Osborn CI. *Id.* If he is released, he has a stable and safe home environment to which he can return. Mr. Terwilliger's daughter, who lives in Georgia, is able to provide transportation for Mr. Terwilliger from Osborn CI to her home in Georgia. DeSalvo Decl. ¶ 16. She lives on a farm in a rural area, where Mr. Terwilliger will be able to socially distance himself from others. *Id.* ¶ 17. Compared to crowded prison facilities, relocating to his daughter's home drastically decreases Mr. Terwilliger's chances of contracting the virus or passing the virus were he to unknowingly contract it.

## ARGUMENT

### I.      Standard of Review

The standards for granting a temporary restraining order ("TRO") are the same standards that govern preliminary injunctions. *See Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992); *Maxum Petroleum, Inc. v. Hiatt*, No. 3:16-CV-01615 (VLB), 2016 WL 5496283, at *1 (D. Conn. 2016); *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008). For a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Second Circuit has long held that the *Winter* factors are properly balanced with a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)). Mr. Terwilliger meets all four *Winter* factors, and therefore more than satisfies the Second Circuit alternative of "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Id*.

## II.    Mr. Terwilliger faces irreparable harm if he continues to be incarcerated.

The threat of irreparable harm to Mr. Terwilliger is immense. At eighty years old and suffering from grave underlying health conditions, including severe cardiovascular disease, Mr. Terwilliger is likely to suffer severe illness or death if he becomes infected with COVID-19 in DOC custody. Irreparable harm is the threshold requirement for the granting of a TRO. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). Furthermore, "the Second Circuit has deemed the threshold showing of 'irreparable harm' to be of particular significance under Rule 65, regardless of the strength of the movant's case on the merits." *AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 387 (S.D.N.Y. 2002).

The Supreme Court has determined that substantially increased risk of serious illness and death always constitutes irreparable injury. *See, e.g.*, *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.");

12

*Stagliano v. Herkimer Cent. Sch. Dist.*, 151 F. Supp. 3d 264, 273 (N.D.N.Y. 2015) ("[T]he obvious potential for such issues as developing chronic health issues or spreading contagious diseases underscores the need for equitable relief . . . ."). Harm is irreparable when money damages after the matter is resolved will not be adequate redress. *See JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). Here, no amount of damages could make Mr. Terwilliger or his family whole if he dies a preventable death while in custody. Furthermore, alleged violations of constitutional rights, such as those made here by Mr. Terwilliger, amount to irreparable injury. *See, e.g.*, *Conn. Dep't Envtl. Prot. v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

Other federal courts around the country have found the threat posed by the COVID-19 pandemic to constitute irreparable injury for the purposes of temporary restraining orders and preliminary injunctions. *See Castillo v. Barr*, No. CV 20-00605, at *5-6 (C.D. Cal. Mar. 27, 2020) (finding that petitioners should be released from immigration custody because they established irreparable harm stemming from risk of exposure to COVID-19); *Coronel*, 2020 WL 1487274, at *3 ("Due to their serious underlying medical conditions, all Petitioners face a risk of severe, irreparable harm if they contract COVID-19."); *Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020) ("The risk that Petitioners will face a severe, and quite possibly fatal, [COVID-19] infection if they remain in immigration detention constitutes irreparable harm warranting a TRO.").

Mr. Terwilliger is at a high risk of suffering irreparable harm if he remains incarcerated. Given the extreme risk of uncontrolled COVID-19 spread in the prison system and Mr. Terwilliger's high degree of susceptibility, to wait for a final resolution to this petition will be to wait too long. The largest study of COVID-19 patients found an overall case-fatality rate

13

("CFR") of 2.3%.[24] In contrast, the CFR for individuals aged 80 years and older is 14.8%—

approximately seven times that of the general population.[25] Mr. Terwilliger has also survived

multiple heart attacks. The CFR for individuals with cardiovascular disease is 10.5%—

approximately five times that of the general population.[26] Already approved for release and

nearing the end of his sentence, Mr. Terwilliger faces a potential injury that is particularly

grievous because it is so readily avoidable if he is released.

III.     **Mr. Terwilliger is substantially likely to succeed on the merits of his claims.**

Mr. Terwilliger has suffered violations of his constitutional and statutory rights.

Respondents have acted with deliberate indifference to his medical needs, placing him in danger

from their inadequate response to his high risk from COVID-19. Moreover, they have failed to

accommodate his disabilities in their refusal to release him to a safe environment.

Mr. Terwilliger is likely to succeed on the merits of both his Eighth Amendment and ADA

claims.

A.   **Respondents have exhibited "deliberate indifference" towards Mr. Terwilliger's**
     **medical needs in violation of the Eighth Amendment.**

In light of COVID-19, Mr. Terwilliger's continued incarceration constitutes cruel and

unusual punishment. By failing to abate the risks he faces from COVID-19, Respondents are

deliberately indifferent to Mr. Terwilliger's serious medical needs in contravention of the Eighth

Amendment.

---

[24] Zunyou Wu & Jennifer M. McGoogan, *Characteristics of and Important Lessons from the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72,314 Cases from the Chinese Center for Disease Control and Prevention*, 323(13) J. Am. Med. Ass'n 1239, 1239 (2020).
[25] *Id.*
[26] *Id.*

The Eighth Amendment's ban on cruel and unusual punishment safeguards the rights of prisoners while in state custody. Under the Eighth Amendment, the Government has an affirmative duty to provide conditions of reasonable health and safety to those in its custody. *DeShaney v. Winnebago County Dep't Soc. Servs.*, 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."). This affirmative duty includes the obligation to provide adequate care to inmates with acute medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prove that the Government breached this duty, a petitioner must show that prison authorities exhibited "deliberate indifference" to his or her medical needs. *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). The "deliberate indifference" test requires that a petitioner prove (1) "that his medical condition is objectively a serious one" and (2) "that the defendant acted with deliberate indifference to [the plaintiff's] medical needs." *Id.*

First, Mr. Terwilliger's medical conditions plainly surpass the standard required to show an objectively serious medical need. The Second Circuit has considered a variety of factors in determining whether a medical condition is objectively serious. That "non-exhaustive" set of factors includes (1) "whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain.'" *Brock*, 315 F.3d at 162. Even before the COVID-19 outbreak, Mr. Terwilliger had medical conditions significant enough to meet the *Brock* standards based on his severe cardiovascular disease complicated by multiple heart attacks, chronic hypertension, and stroke.

Those underlying medical conditions—combined with Mr. Terwilliger's advanced age—would put him at a high risk of death were he to contract COVID-19, a possibility that becomes more likely with each passing day. Indeed, the Eighth Amendment's "deliberate indifference" inquiry specifically encompasses the risk of *future harm* in its analysis. In *Helling v. McKinney*, the Supreme Court held that a prisoner's exposure to second-hand smoke constituted a viable Eighth Amendment claim, even before contracting any second-hand-smoke related illness. 509 U.S. at 35. "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them," the Court observed. *Id.* at 33-34. Similarly, the *Helling* Court explained that prison officials cannot "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Id.* at 33. In Mr. Terwilliger's case, that possibility of serious illness or death grows each day he spends incarcerated.

Under the "deliberate indifference" test, an individual must next show that prison officials "acted with deliberate indifference to [the plaintiff's] medical needs." *Brock*, 315 F.3d at 162; *see also Estelle*, 429 U.S. at 104. To meet this second prong, he or she is required to prove that "the prison official knew of and disregarded the plaintiff's serious medical needs." *Harrison v. Barkley*, 219 F.3d 132, 137 (2d. Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)). A prisoner need not show that an official acted "for the very purpose of causing harm," *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), but must show that an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it," *Harrison*, 219 F.3d at 137 (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). The Supreme Court has directed lower courts to consider "prison authorities' current attitude and conduct" and preventative policies put in place in determining whether officials are

deliberately indifferent to medical needs. *Helling*, 509 U.S. at 36 (directing the court of appeals, on remand, to evaluate the plaintiff's Eighth Amendment claim in light of a new smoking policy put in place in the course of the litigation).

Respondents are aware of and recklessly indifferent to the grave threat COVID-19 presents to Mr. Terwilliger. In Osborn CI, officials carelessly reintegrated quarantined individuals who shared a housing space with an inmate who tested positive for COVID-19 into the broader facility.[27] Nearly two weeks ago, on April 10, at least nine other inmates from the same unit tested positive for the virus.[28] Though the DOC now refuses to release facility-level data as to the number of inmates with COVID-19, that number at Osborn CI has almost surely gone up since April 10. DOC is aware of Mr. Terwilliger's serious health conditions, and has acknowledged their severity by categorizing Mr. Terwilliger as a 4 out of 5 on its health rating scale (5 is the most serious rating). Smith Decl., Exh. D at 1. Respondents' reintegration of quarantined inmates highlights its failure to take necessary precautions in response to the COVID-19 outbreak. This failure is exacerbated by the extreme risk it poses to people like Mr. Terwilliger. Respondents knew they had Mr. Terwilliger in their care, yet "fail[ed] to take reasonable measures" to mitigate the risk he faces. *Farmer*, 511 U.S. at 847.

The reckless action officials at Osborn CI took in reintegrating quarantined inmates into the broader facility underscores Respondents' deficient response to the COVID-19 pandemic. Current DOC policies put in place that are meant to slow the spread of COVID-19 will fail to meaningfully keep inmates like Mr. Terwilliger from harm's way. Prison layouts are largely

---

[27] Eliza Fawcett & Steven Goode, *State Department of Correction Moves Inmates with COVID-19 to Northern Correctional Institution, Though Quarantine Questions Persist*, Hartford Courant (Apr. 10, 2020), https://www.courant.com/coronavirus/hc-news-coronavirus-northern-correctional-institution-20200410-scty5r36yzgzflkw7a3iuw7gam-story.html.
[28] *Id.*

incompatible with social distancing, with shared cells, showers, and communal food preparation. Gonsalves Decl. ¶ 17. Mr. Terwilliger has a cellmate, increasing his potential exposure to COVID-19. Terwilliger Decl. ¶ 5. Respondents have also lagged in releasing currently incarcerated inmates, a necessary step to ensure that inmates and correctional officers left behind can effectively social distance.[29] Finally, Respondents' health care system is grossly inadequate. The available data indicate a severe shortage of doctors and nurses on staff: one nurse for every 43 prisoners, and one doctor or physician's assistant for every 579 prisoners.[30]

Mr. Terwilliger is eighty years old. He has grave health concerns and has already been approved for community release. Yet he remains incarcerated while a pandemic spreads through Connecticut prisons like wildfire. The unconstitutionally dangerous conditions at Osborn CI will inevitably lead to the illness—and death—of prisoners and corrections officers alike. Respondents know that Mr. Terwilliger is especially at risk of death were he to contract COVID-19. The Eighth Amendment bars this imminent, deadly exposure to COVID-19; Plaintiff is therefore highly likely to succeed on the merits of his claim.

### B. Respondents have discriminated against Mr. Terwilliger on the basis of his disability in violation of the ADA.

Mr. Terwilliger has limited mobility because of his heart condition, degenerative joint disease, and advanced age, and he has hearing impairment serious enough to impede his communication. His hypertension, bilateral hearing loss, and degenerative joint disease were

---

[29] Kelan Lyons, *Shifting Plans and a COVID-19 Outbreak at a Connecticut Prison*, CT Mirror (Apr. 17, 2020), https://ctmirror.org/2020/04/17/shifting-plans-and-a-covid-19-outbreak-at-a-connecticut-prison ("There were 1,022 fewer people in state jails and prisons on April 17 than March 1, primarily because there are fewer people entering the criminal justice system.").
[30] Jenna Carlesso & Kelan Lyons, *One Year After DOC Took Over Inmate Healthcare, Troubles Persist*, Conn. Mirror (July 2, 2019), https://ctmirror.org/2019/07/02/one-year-after-doc-took-over-inmate-healthcare-troubles-persist.

each rated 10% disabling by the VA nearly 20 years ago. Smith Decl. ¶ 3, Exh. B at 1-2. Since

then, he has suffered multiple heart attacks, including ones in 2012 and early 2015. DeSalvo

Decl. ¶¶ 7-9. He has also suffered from blood clots and pleurisy. DeSalvo Decl. ¶ 10. These

disabilities, and the corresponding increased risk from COVID-19, give him a substantial

likelihood of success on the merits of his claim under Title II of the Americans with Disabilities

Act ("ADA") that Respondents have failed to make a reasonable accommodation for his

disability by releasing him from Osborn CI.

Title II of the ADA prohibits public entities from discriminating against qualified

individuals with disabilities by depriving them of the opportunity to participate in the services,

programs, or activities of the public entity because of their disabilities. 42 U.S.C. § 12132. Title

II of the ADA applies to DOC, as "[s]tate prisons fall squarely within the statutory definition of

'public entity'" under the ADA. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210

(1998); *see also Torrez v. Semple*, No. 3:17-CV-1232, 2018 WL 2303018, at \*7 (D. Conn. 2018)

("The Supreme Court has held that Title II of the ADA is applicable to state prisons."); *Parks v.

Blanchette*, 144 F. Supp. 3d 282, 337 n.37 (D. Conn. 2015) ("Both the ADA and the

Rehabilitation Act apply to inmates housed in state prisons."); *Riddick v. Dep't of Corr.*, No.

3:13-CV-656, 2013 WL 6118354, at \*3 (D. Conn. 2013) ("The State of Connecticut and the

Connecticut Department of Correction are public entities within the meaning of the ADA.").

An individual establishes a prima facie violation of Title II of ADA by showing that: (1)

he is a qualified individual with a disability; (2) the defendant is an entity subject to the acts; and

(3) the plaintiff was denied the opportunity to participate in or benefit from the entity's services,

programs, or activities or the entity otherwise discriminated against him by reason of his

disability. *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).

19

Discrimination under Title II of the ADA can take the form of "(1) intentional discrimination (disparate treatment); (2) disparate impact of facially nondiscriminatory treatment; and (3) failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009). Plaintiffs must show that the public entity has failed to provide them with meaningful access to a benefit it offers. *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 198 (2d Cir. 2014).

Mr. Terwilliger's medical conditions qualify as disabilities under the ADA in that they substantially limit major life activities, including respiratory and circulatory functions, breathing, walking, and hearing. *See* 42 U.S.C. § 12102(2). Respondents have failed to make a reasonable accommodation for Mr. Terwilliger such that, under these circumstances, his disability renders the conditions of his custody unreasonably dangerous to him.

Certain disabilities put individuals at increased risk of serious consequences from COVID-19, including cardiovascular disease.[31] The only viable accommodation for Mr. Terwilliger's disability is release from physical custody; there is no DOC facility to which he could be transferred that would appropriately mitigate the significant health risks posed by COVID-19. Imposition of conditions of solitary confinement, which DOC has used as a strategy for mitigating COVID-19 risk in other inmates, would threaten serious harm to someone of his age and medical history. Solitary confinement also would not substantially reduce his risk of exposure to the virus, given the high rates of correctional staff infection and continued use of communal spaces. Respondents have the discretion to release Mr. Terwilliger to his family through discretionary

---

[31] Zunyou Wu & Jennifer M. McGoogan, *Characteristics of and Important Lessons from the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72,314 Cases from the Chinese Center for Disease Control and Prevention*, 323(13) J. Am. Med. Ass'n 1239 (2020).

release mechanisms, but they have not given him meaningful access to that possibility. Despite having been approved for community release, Mr. Terwilliger remains incarcerated. Terwilliger Decl. ¶ 3.

Furthermore, Mr. Terwilliger is likely to succeed on the merits of an ADA disparate impact claim because, given his disabilities, he is less likely to receive life-saving treatment than others. Because of his age and heart conditions, he may be a low priority for accessing a ventilator.[32] The only way to avoid this disparate impact is to avoid contracting COVID-19—an outcome that Respondents have no effective means of ensuring short of granting release.

The requested relief under the ADA would not pose significant health and safety risks to others. *See* 42 U.S.C. § 12182(b)(3); *Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 287 (1987) (holding that a person who poses a significant risk to others is not "otherwise qualified" for the activity). There can be no legitimate penological interest in keeping an 80-year-old disabled veteran incarcerated past the point at which he was approved for community release, thereby risking exposure to a fatal infection. *Cf. Gates v. Rowland*, 39 F.3d 1439, 1446-47 (9th Cir. 1994). No deference is owed in this context to the discretion of DOC officials, given the unprecedented nature of the crisis that gives rise to this suit. Thus Mr. Terwilliger is likely to succeed on the merits of his ADA claim.

**C. Exhaustion of state court remedies is not required and would be futile.**

This habeas petition is brought pursuant to 28 U.S.C. § 2241(c)(3), as Mr. Terwilliger is "in custody in violation of the Constitution or laws . . .  of the United States" and he challenges

---

[32] Complaint of Disability Rights Washington, et al., at 2 (Mar. 23, 2020), https://clearinghouse.net/chDocs/public/DR-WA-0003-0001.pdf (explaining that treatment plans give priority to treating people who are younger and healthier while leaving those who are older and sicker to die).

neither his judgment of conviction nor his sentence. There is no statutory exhaustion requirement for 28 U.S.C. § 2241 habeas petitions. Mr. Terwilliger also relies in the alternative on 28 U.S.C. § 2254, which does have a statutory exhaustion requirement, but it is unnecessary for this Court to reach that exhaustion requirement if Court rules on the petition based on section 28 U.S.C. § 2241 alone.

If this Court concludes that there is a prudential exhaustion requirement under 28 U.S.C. § 2241, *see United States ex rel. Scranton v. New York*, 532 F.2d 292, 294 (2d Cir. 1976), or that this petition is properly brought pursuant only to 28 U.S.C. § 2254, any usual requirement to exhaust state court remedies should be excused as futile because it would cause needless, potentially fatal delay. Section 2254 excuses exhaustion if "there is an absence of available State corrective process," or "circumstances exist that render such process ineffective to protect the rights of the applicant." *Id.* §§ 2254(b)(1)(B)(i)-(ii); *see also Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) ("An exception is made only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief."); *Lurie v. Wittner*, 228 F.3d 113, 123-24 (2d Cir. 2000) (confirming that the standard after the enactment of AEDPA "is substantially identical to the pre-AEDPA exhaustion standard" and that "[w]here there is no further state proceeding for petitioner to pursue, or where further pursuit would be futile, this Court can, in certain circumstances, address the merits of a habeas petition even if it contains unexhausted claims" (citations omitted)); *Washington v. James*, 996 F.2d 1442, 1449 (2d Cir. 1993) (recognizing "the statutory exception permitting non-exhaustion where recourse to state remedies is futile").

The imperative to waive the exhaustion requirement due to futility is strongest when the "absence of state corrective process" is "attributable to the state, not to the petitioner." *Jumpp v.*

*Cournoyer*, No. 3:15-CV-00892, 2016 WL 3647146, at *3 (D. Conn. 2016). This state-created procedural void can occur if "no corrective procedure at all exists to redress a particular constitutional violation" or if "a corrective procedure exists but 'the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process.'" *Francis S. v. Stone*, 995 F. Supp. 368, 379-80 (S.D.N.Y. 1998), *aff'd,* 221 F.3d 100 (2d Cir. 2000) (quoting *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977)).

The COVID-19 pandemic has rendered the state courts an ineffective avenue to protect Mr. Terwilliger's rights. The Connecticut Judicial Branch is operating at severely reduced capacity. According to its March 12, 2020 "Continuity of Operations Plan," it is scheduling and hearing only items considered "Priority 1 Business Functions."[33] Habeas petitions do not fall in this category, nor do any other mechanisms through which individuals in custody may challenge the legality of their confinement.[34] Connecticut General Statutes § 52-466 requires that a petition for a writ of habeas corpus be made to the Superior Court for the Tolland Judicial District, yet no courthouse is open in the Tolland Judicial District, and no courthouse has been specified for transfer of matters ordinarily before that court. While the six operating Superior Courts have recently begun accepting non-Priority 1 civil filings via lockboxes in their lobbies, there has been no provision made for filings at the Superior Courts, including the Tolland Judicial District, which are not currently operating, nor for expedited processing of emergency filings.[35] This functional closure of Connecticut courts constitutes an absence of a state corrective process through which Mr. Terwilliger can protect his rights.

---

[33] State of Connecticut Judicial Branch, *COVID-19 Information from the Connecticut Judicial Branch* (Apr. 17, 2020), https://jud.ct.gov/COVID19.htm.
[34] *Id.*
[35] *Id.*

Inordinate delay can also render state courts unavailable, and therefore exhaustion futile. *Mathis v. Hood*, 851 F.2d 612, 614 (2d Cir. 1988) (waiving exhaustion in light of "extraordinary delays which infect the system"); *Sapienza v. Vincent*, 534 F.2d 1007, 1010 (2d Cir. 1976) ("Inordinate delay in concluding its post-judgment criminal proceedings may preclude a state from relying on the exhaustion requirement to defeat Federal review."); *U.S. ex rel. Goodman v. Kehl*, 456 F.2d 863, 869 (2d Cir. 1972) ("An inordinate and unjustified delay in the state corrective process may well result in the frustration of petitioner's rights and be such a circumstance as to render that process ineffective, . . . and in such cases the exhaustion requirement will be deemed satisfied [under 28 U.S.C. 2254(b)]."); (internal citation and quotation marks omitted); *Riles v. Warden, State Prison*, No. 3:14CV1420, 2016 WL 1239220, at *3 (D. Conn. 2016) ("Inordinate and unjustified delay by the state in processing a habeas claim may render the state remedy ineffective."); *Swain v. Murphy*, No. 308-CV-1394, 2010 WL 1279051, at *2 (D. Conn. 2010) (same); *Hill v. Mance*, 598 F. Supp. 2d 371, 375-76 (W.D.N.Y. 2009) (holding that "requiring exhaustion would cause irreparable injury to the petitioner's rights since undue delay in the state courts risks mooting the petitioner's federal rights before he reaches the federal courts" (internal citation and quotation marks omitted)); *Cholewinski v. Armstrong*, No. 3:98CV1964, 2000 WL 303252, at *3 (D. Conn. 2000) ("[F]ederal courts have dispensed with the exhaustion requirement because of delay on the part of the state or manifest injustice to the petitioner.").

Further, waiver of exhaustion is warranted due to futility when the consequences of delay would be disastrous, causing Mr. Terwilliger to "suffer irreparable harm." *See, e.g.*, *Pimentel v. Gonzales*, 367 F. Supp. 2d 365, 371-72 (E.D.N.Y. 2005) (considering a 28 U.S.C. § 2241 claim by a person whose total sentence was shorter than the time needed for administrative review). In

a different but closely-related context, courts considering requests for compassionate relief during the COVID-19 pandemic have found cause to waive administrative exhaustion requirements due to the futility of the exercise and the potential for harm. Indeed, "[e]ven where exhaustion is seemingly mandated by statute or decisional law, the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019). In such cases, "undue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile." *Id.* at 120.

One court considering a plaintiff with medical conditions similar to those of Mr. Terwilliger aptly observed that "delaying release amounts to denying relief altogether." *United States v. Perez*, No. 17 CR. 513-3, 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020) (granting release where the plaintiff "had two surgeries while incarcerated, and continues to suffer severe side effects such as ongoing pain and persistent vision problems"). There, as here, the plaintiff's "undisputed fragile health, combined with the high risk of contracting COVID-19 [while incarcerated for even a few weeks] justifies waiver of the exhaustion requirement." *Id.*; *see also New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) ("[E]nforcement of the exhaustion requirement would cause the claimants irreparable injury" by risking "deteriorating health, and possibly even . . . death."); *United States v. McCarthy*, No. 3:17-CR-0230, 2020 WL 1698732, at *3-4 (D. Conn. Apr. 8, 2020) (waiving exhaustion requirement in light of "potential for serious health consequences" to defendant due to COVID-19); *United States v. Zukerman*, No. 16 CR. 194, 2020 WL 1659880, at *2-4 (S.D.N.Y. Apr. 3, 2020) (considering a plaintiff who "is 75 years old and suffers from diabetes, hypertension and obesity" and holding that his "advanced age and compromised health, combined with the high risk of contracting COVID-19 [while incarcerated] justify waiver of the exhaustion requirement" given the "exigency of a rapidly advancing pandemic").

This Court should not apply an exhaustion requirement to Mr. Terwilliger's petition under 28 U.S.C. § 2241. Even if, however, this Court applies a prudential exhaustion requirement under 28 U.S.C. § 2241 or the statutory exhaustion requirement of 28 U.S.C. § 2254, given the unavailability of the state courts and Mr. Terwilliger's heightened risk from COVID-19, requiring him to proceed through state channels would be futile and potentially cause catastrophic and irreparable injury. Under these circumstances, exhaustion of state remedies is not required.

### IV.     The equities and public interest weigh in favor of releasing Mr. Terwilliger.

The equities and public interest factors, which "merge" when the government is the opposing party, favor Mr. Terwilliger's release for two reasons. *Coronel*, 2020 WL 1487274, at *7 (citing *Planned Parenthood of New York City v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018)). First, "the public interest is best served by ensuring the constitutional rights of persons within the United States are upheld." *Coronel*, 2020 WL 1487274, at *7 (quoting *Sajous v. Decker*, 2018 WL 2357266, at *13 (S.D.N.Y. 2018)). Given Respondents' ongoing violation of Mr. Terwilliger's constitutional rights, the public interest is best served by his release.

Second, courts have recognized the overwhelming "public interest" in releasing vulnerable individuals "in light of the rapidly-evolving public health crisis engendered by the spread of COVID-19." *Coronel*, 2020 WL 1487274, at *8; *see also Grand River Enterprises Six Nations v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (identifying "public health" as a "significant public interest"). Medical experts agree that prisons are hotbeds for the spread of COVID-19 and the *only* way to protect vulnerable prison populations and avoid overwhelming the hospital

26

system as a whole is taking immediate steps towards decarceration. *See* Altice Decl. ¶ 21;

Gonsalves Decl. ¶¶ 29-30.

Lastly, the government cannot justify continuing to incarcerate Mr. Terwilliger, an 80-

year-old disabled veteran with underlying medical conditions who is approaching the end of a

20-year prison sentence and whom Respondents have already approved for community release—

an acknowledgment that Mr. Terwilliger poses no risk to public safety. The most prudent course

of action, both for his benefit and for public health overall, is for the Court to order

Mr. Terwilliger's release to a safe home environment where he can self-isolate and will neither

contract COVID-19 nor transmit COVID-19 to others.

### V.     This Court has the equitable power to release Mr. Terwilliger while his habeas petition is pending.

This Court has the "inherent authority" to admit Mr. Terwilliger to bail and order his

release pending the adjudication of his habeas petition. *Mapp v. Reno*, 241 F.3d at 226. The

Second Circuit has recognized that such an order is appropriate where the petitioner "raises

substantial claims" and demonstrates that "extraordinary circumstances exist that make the grant

of bail necessary to make the habeas remedy effective." *Id.* at 230 (quoting *Iuteri v. Nardoza*,

662 F.2d 159, 161 (2d Cir. 1980)); *see also Ostrer v. United States*, 584 F.2d 594, 596 n.1 (2d

Cir. 1978); *Gaymon v. Whidden*, No. 3:11-cv-805, 2011 WL 2078632 (D. Conn. 2011)

(recognizing the existence of such power with respect to a petitioner seeking relief under 28

U.S.C. § 2254); *Rado v. Meachum*, 699 F. Supp. 25, 26 (D. Conn. 1988) ("A federal court has

the inherent power to release a state prisoner on bail pending resolution of his habeas petition.").

Mr. Terwilliger meets the *Mapp* factors and qualifies for immediate admission to bail.

First, he not only raises "substantial claims" in his habeas petition, but has demonstrated a

substantial likelihood of success on the merits. *See supra* Section III; *see also Gaymon*, 2011 WL

27

2078632, at *1 ("To satisfy the first part of the test, the petitioner must present merits that are more than slightly in petitioner's favor." (internal quotation marks and citations omitted)).

Second, the unique threat that COVID-19 poses to Mr. Terwilliger, given his advanced age and underlying medical conditions, is an "extraordinary circumstance" that merits immediate release. Courts have recognized that "[s]evere health issues" are the "prototypical but rare case of extraordinary circumstances that justify release pending adjudication of habeas." *Coronel*, 2020 WL 1487274, at *9. District courts have recognized that the unprecedented and extraordinary risk that COVID-19 poses to public health—especially in settings such as prisons where social distancing and containment are difficult or impossible—is such an "extraordinary circumstance" that it warrants the release of detained and incarcerated persons before ruling on the merits of their habeas petitions. *See, e.g.*, *id.*; *United States v. Nkanga*, 2020 WL 1695417, at *3 (S.D.N.Y. Apr. 7, 2020) (defendant's "age" and "multiple health issues" constituting "extraordinary circumstances" in light of COVID-19); *Hernandez v. Decker*, 2020 WL 1547459, at *3 (S.D.N.Y. Mar. 31, 2020) ("continued risk of exposure to COVID-19" constituting "extraordinary circumstances"); *Savino v. Souza*, ---F.Supp.3d---. 2020 WL 1703844, at *8-9 (D. Mass. Apr. 8, 2020) (acknowledging this "nightmarish pandemic" as constituting "extraordinary circumstances" justifying release under *Mapp*).

Third, Mr. Terwilliger's release is "necessary to make the habeas remedy effective," because "the risks posed by COVID-19 are imminent." *Coronel*, 2020 WL 1487274, at *8-9. Keeping Mr. Terwilliger incarcerated while adjudicating his petition would subject him to a "significant risk" of contracting COVID-19, "the very outcome [he] seek[s] to avoid." *Id*. Judges in the District of Connecticut have recognized that "catastrophic health consequences" will very possibly befall elderly and medically vulnerable individuals in prison if they remain incarcerated.

*See, e.g.*, *United States v. McCarthy*, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (granting immediate release of a 65-year-old federal prisoner despite failure to exhaust administrative remedies). Immediate release is Mr. Terwilliger's only effective remedy.

Finally, this Court also has the equitable power to order the release of incarcerated persons where unconstitutional conditions are not corrected "within a reasonable time." *Rhem v. Malcolm*, 507 F.2d 333, 341 n.20 (2d Cir. 1974); *see also Brown v. Plata*, 563 U.S. 493, 511 (2011); *Detainees of Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392, 399 (2d Cir. 1975). In light of Respondents' inability to address the rapid spread of COVID-19 and adequately provide a safe environment for vulnerable individuals like Mr. Terwilliger, *see* Altice Decl. ¶ 20, there is no "reasonable period of time" in which the government can correct its ongoing deprivation of his constitutional right to be free from cruel and unusual punishment, *Rhem*, 507 F.2d at 341 n.20. The District Court therefore has the power to release Mr. Terwilliger immediately.

## CONCLUSION

For the foregoing reasons, Mr. Terwilliger respectfully requests this Court issue a temporary restraining order granting his immediate release.

Dated April 22, 2020

Respectfully submitted,

/s/ Michael J. Wishnie
Jade Ford*
Arjun Mody*
Kayla Morin*
Cara Newlon*
Molly Petchenik*
Leah Samuel*
Blake Shultz*
Casey Smith*
    Law Student Interns

Renée Burbank, ct30669
Marisol Orihuela, ct30543
Michael J. Wishnie, ct27221
Jerome N. Frank Legal Services Organization
Veterans Legal Services Clinic
Yale Law School
P.O. Box 209090
New Haven, CT 06520
Phone: (203) 432-4800
michael.wishnie@ylsclinics.org

*Counsel for Petitioner*

*Law student appearances forthcoming.

30

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2020, I have sent a copy the foregoing Notice of

Appearance by email to counsel for Respondents, Assistant Attorneys General Terrence M.

O'Neill, James M. Belforti, and James W. Donohue. Mr. O'Neill notified counsel for Petitioner

on April 22, 2020, that he would accept service for Respondents by email.

Respectfully submitted,

/s/ Michael J. Wishnie
Michael J. Wishnie
Jerome N. Frank Legal Services Organization
Veterans Legal Services Clinic
Yale Law School
P.O. Box 209090
New Haven, CT 06520
Phone: (203) 432-4800
michael.wishnie@ylsclinics.org

*Counsel for Petitioner*